UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Nebraska Beef Limited,

Plaintiff,

v.

Civ. No. 01-2375 (JNE/JGL)
ORDER

Wells Fargo Business Credit, Inc.,

Defendant.

---

Mathew M. Meyer, Esq., Moss & Barnett, P.A., appeared for Plaintiff Nebraska Beef Limited.

Charles F. Webber, Esq., Faegre & Benson LLP, appeared for Defendant Wells Fargo Business Credit, Inc.

---

This action arises out of a debtor-creditor relationship that terminated in 1997. The debtor, Nebraska Beef Limited, brought the action against the creditor, Wells Fargo Business Credit, Inc. (WFBCI), to recover fees charged because Nebraska Beef took "overadvances." WFBCI asserted a counterclaim to recover additional interest and fees due to Nebraska Beef's default. The case is before the Court on Nebraska Beef's Motion for Summary Judgment and WFBCI's Motion for Partial Summary Judgment. For the reasons set forth below, the Court denies Nebraska Beef's motion and grants WFBCI's motion.

## I. BACKGROUND

### A. Nebraska Beef's claim to recover overadvance fees

From 1995 to 1997, WFBCI and Nebraska Beef were parties to a credit agreement, which they amended on several occasions. On May 29, 1996, they executed an Amended and Restated Credit and Security Agreement (Amended Agreement). That agreement defined the Borrowing Base, the maximum that Nebraska Beef could borrow, as the lesser of: (1) $30,000,000, less a



FILED JAN 2 0 2004
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

reserve for cattle vendor exposure; or (2) the Borrowing Power generated on receivables, inventory, and equipment, less a reserve for cattle vendor exposure. WFBCI reserved the right to refuse to make overadvances, that is, to loan Nebraska Beef more than the Borrowing Base. The Amended Agreement did not provide for an ongoing overadvance limit or overadvance fee arrangement, though it did require Nebraska Beef to pay to WFBCI $500 per day for overadvances made in May 1996 under the former credit agreement.

In September 1996, Nebraska Beef asked to take overadvances. WFBCI agreed and the parties executed a First Amendment to Amended and Restated Credit and Security Agreement (First Amendment). The First Amendment provided for an "Overadvance Component" from September 10 through September 30 and corresponding "Overadvance Fees" of $750 per day.

The following spring, Nebraska Beef again sought to take overadvances. WFBCI agreed and the parties executed a Third Amendment to Amended Restated Credit and Security Agreement (Third Amendment) on April 18, 1997. The Third Amendment provided for an Overadvance Component from April 14 through April 30 and Overadvance Fees that increased over time. From April 14 through April 20, the fee was $500 per day per $150,000 increment. From April 21 through April 27, the fee was $1,000 per day per $150,000 increment. From April 28 through April 30, the fee was $1,500 per day per $150,000 increment.

Nebraska Beef took overadvances during the entire month of May 1997. On May 23, 1997, WFBCI sent a draft amendment to the Amended Agreement (May Draft) to Nebraska Beef. The May Draft provided for Overadvance Fees of $1,500 per day through May 26, 1997, and $2,000 per day from and after May 27, 1997, per $150,000 increment. Nebraska Beef did not execute the May Draft.

In early June 1997, Nebraska Beef received a monthly statement from WFBCI listing the Overadvance Fees charged in May 1997. Nebraska Beef asked WFBCI to reduce the fees. Later that year, the parties terminated the Amended Agreement. The payment submitted by Nebraska Beef to WFBCI as part of the termination of their credit relationship included the May 1997 Overadvance Fees. Nebraska Beef seeks to recover those fees.

### B. WFBCI's counterclaim for fees and interest due to Nebraska Beef's default

Nebraska Beef was in default of the Amended Agreement between December 1, 1996, and June 30, 1997. WFBCI repeatedly informed Nebraska Beef of the defaults. By letter dated June 30, 1997, WFBCI informed Nebraska Beef that WFBCI would impose the Amended Agreement's default interest rate from July 1, 1997, until Nebraska Beef was no longer in default. WFBCI also stated that it "elected to exercise only certain remedies at this time" and that it "preserve[d] its right to exercise any other rights or remedies" in the Amended Agreement. WFBCI seeks to recover additional interest and fees as a result of Nebraska Beef's default from December 1, 1996, through June 30, 1997.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts

showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Nebraska Beef's claim for May 1997 Overadvance Fees**

*1. Nebraska Beef's motion*

Nebraska Beef asserts that it is entitled to summary judgment on its claim to recover the May 1997 Overadvance Fees because WFBCI had no legal or contractual right to charge the fees. It first argues that WFBCI's failure to obtain Nebraska Beef's written agreement to charge Overadvance Fees in May 1997 renders any alleged credit agreement unenforceable under Minnesota law. Nebraska Beef relies on Minn. Stat. § 513.33 (2002), which provides in relevant part: "A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." *Id.*, subd. 2. According to Nebraska Beef, *Drewes v. First National Bank of Detroit Lakes*, 461 N.W.2d 389 (Minn. Ct. App. 1990), establishes that section 513.33 is constitutional only if applied equally to creditors and debtors. Nebraska Beef contends that the failure to adhere to the requirements of section 513.33 renders any credit agreement unenforceable by either the debtor or the creditor.

The Court rejects Nebraska Beef's argument. *Drewes* holds that that section 513.33 is constitutional notwithstanding its application only to claims by debtors:

> Here, the trial court found that the statute had a significant and legitimate purpose in preventing fraud in credit claims. Debtors argue that the purpose of the statute is to protect a narrow interest group of financial institutions rather than the interests of the public. Creditor argues that, although it applies only to lenders, this statute of frauds benefits the general public. We agree that requiring claims by debtors to be based on written credit agreements does not benefit a

> small interest group, but is supported by the significant legislative purpose of protecting financial institutions and their depositors against fraudulent claims.

461 N.W.2d at 392. By its terms, section 513.33 applies only to an action on a credit agreement maintained by a debtor. WFBCI is not a debtor. Nor is it seeking to maintain an action on a credit agreement. Section 513.33 does not entitle Nebraska Beef to recover the May 1997 Overadvance Fees.

Nebraska Beef next argues that it is entitled to summary judgment on its claim for the May 1997 Overadvance Fees because WFBCI failed to comply with the Amended Agreement's requirement that WFBCI obtain a written amendment to assess the fees.[1] WFBCI accurately responds that Minnesota law provides that parties to a contract may agree to extend or renew a contract without putting that agreement in writing even though the original contract requires such an agreement to be in writing. *Fischer v. Pinske*, 243 N.W.2d 733, 735 (Minn. 1976). Similarly, a contractual provision that specifies the exclusive means to modify a contract does not prevent

---

1 Nebraska Beef relies on Section 9.4 of the Amended Agreement, which states:

> TO PROTECT THE BORROWER AND THE LENDER FROM ANY MISUNDERSTANDINGS OR DISAPPOINTMENTS, ANY CONTRACT, PROMISE, UNDERTAKING OR OFFER TO FOREBEAR REPAYMENT OF MONEY OR TO MAKE ANY OTHER FINANCIAL ACCOMODATION IN CONNECTION WITH THE COLLATERAL, REAL ESTATE, ADVANCES AND LETTERS OF CREDIT, OR ANY AMENDMENT OF, CANCELLATION OF, WAIVER OF, OR SUBSTITUTION FOR ANY OR ALL OF THE TERMS OR PROVISIONS OF ANY INSTRUMENT OR DOCUMENT EXECUTED IN CONNECTION WITH THE COLLATERAL, REAL ESTATE, ADVANCES AND LETTERS OF CREDIT, MUST BE IN WRITING TO BE EFFECTIVE. Without limiting the generality of the foregoing, no amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

its modification by another method. *Goshey v. ITT Life Ins. Corp.*, 590 F.2d 737, 740 (8th Cir. 1979); *Larson v. Hill's Heating & Refrigeration of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987). Hence, the absence of a document signed on behalf of Nebraska Beef to authorize fees for overadvances in May 1997 does not necessarily entitle Nebraska Beef to recover the May 1997 Overadvance Fees.

WFBCI argues *inter alia* that it properly charged the May 1997 Overadvance Fees because the parties formed a unilateral contract when Nebraska Beef accepted WFBCI's offer to allow overadvances in exchange for a fee by taking overadvances. As set forth below in the discussion of WFBCI's motion, the record contains evidence supporting WFBCI's argument. Viewed in the light most favorable to WFBCI, the record reveals that WFBCI properly charged the May 1997 Overadvance Fees to Nebraska Beef. Accordingly, the Court concludes that Nebraska Beef is not entitled to summary judgment on its claim to recover the May 1997 Overadvance Fees.

*2. WFBCI's motion*

WFBCI asserts that it is entitled to summary judgment on Nebraska Beef's claim to recover the May 1997 Overadvance Fees because the parties formed a unilateral contract when Nebraska Beef accepted WFBCI's offer to allow overadvances in exchange for a prescribed fee by taking overadvances. Under Minnesota law, the formation of a unilateral contract requires a communication of a definite offer and acceptance for valuable consideration. *Hayes v. K-Mart Corp.*, 665 N.W.2d 550, 553 (Minn. Ct. App. 2003).

With regard to the communication of a definite offer, Nebraska Beef asserts that "there was no definite offer as to the price term" because it first learned of the fees applicable upon receipt of the May Draft. The affidavit upon which Nebraska Beef bases this assertion does not

support it. Rather, it simply reveals that Nebraska Beef received the May Draft "[s]ome time after May 23, 1997." The affidavit does not, however, allege that the May Draft constituted Nebraska Beef's first notice of the fees applicable in May. To the contrary, the affidavit recounts discussions between the parties in April about the availability of overadvances in May and acknowledges that WFBCI "proposed" fees during those discussions. Hence, the affidavit does not contradict WFBCI's well-supported assertion that WFBCI agreed to Nebraska Beef's request to allow overadvances in May subject to the continuation of the Third Amendment's fee structure. In the May Draft, WFBCI informed Nebraska Beef of an increase in the fees. Viewed in the light most favorable to Nebraska Beef, the record reveals that WFBCI made a definite offer to Nebraska Beef regarding overadvances in May 1997.

As to Nebraska Beef's acceptance of that offer, Nebraska Beef asserts that "failure to object alone is insufficient to constitute acceptance." Nebraska Beef, however, did not simply remain silent in the face of WFBCI's offer. Rather, it is undisputed that Nebraska Beef took overadvances throughout May 1997, thereby accepting WFBCI's offer to allow overadvances in exchange for a fee. *See Peters v. Mut. Benefit Life Ins. Co.*, 420 N.W.2d 908, 913 (Minn. Ct. App. 1988) ("Once made, an offer may be accepted by performance of the actions contemplated by the offer, thus resulting in the creation of a unilateral contract."). Viewed in the light most favorable to Nebraska Beef, the record reveals that the parties formed a unilateral contract that required Nebraska Beef to pay the May 1997 Overadvance Fees.[2] Accordingly, WFBCI is entitled to summary judgment on Nebraska Beef's claim to recover those fees.

---

[2] In light of this conclusion, the Court declines to consider the parties' arguments about whether the parties impliedly extended the Third Amendment through May 1997 and whether an implied contract existed regarding the May 1997 Overadvances.

**B. WFBCI's counterclaim for fees and interest due to Nebraska Beef's default**

Although Nebraska Beef was in default from December 1, 1996, through June 30, 1997, WFBCI did not impose the default interest rate or default letter of credit fees. WFBCI seeks to recover the additional interest and fees arising out of Nebraska Beef's default during that period. Nebraska Beef asserts that it is entitled to summary judgment on WFBCI's counterclaim because the clear and unambiguous language of the Amended Agreement prohibits WFBCI from imposing the default interest rate or default letter of credit fees after the default period ended.

Under Minnesota law, the interpretation of an unambiguous contract is a question of law. *Trondson v. Janikula*, 458 N.W.2d 679, 681 (Minn. 1980). Unambiguous contractual language must be given its plain and ordinary meaning. *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999).

Nebraska Beef first argues that Section 8.2 of the Amended Agreement precludes WFBCI from imposing the default interest rate and default letter of credit fees unless it does so during the actual default period. Section 8.2 provides in relevant part:

> During any Default Period, the Lender may exercise any or all of the following rights and remedies:
>
> . . . .
>
> (f) the Lender may exercise and enforce its rights and remedies under the Loan Documents; and
>
> (g) the Lender may exercise any other rights and remedies available to it by law or agreement.

Section 8.2 provides that WFBCI "may" exercise its rights and remedies during a default period. It does not require WFBCI to do so. Nor does it provide that a failure to exercise them during the default period forever waives them. The Court therefore rejects Nebraska Beef's contention

that Section 8.2 unambiguously restricts WFBCI's ability to exercise the rights and remedies provided in the Amended Agreement to a default period.

Nebraska Beef next argues that Section 2.11(c) of the Amended Agreement unambiguously provides that WFBCI must impose the default interest rate during the default period or not at all. Section 2.11(c) states:

> At any time during any Default Period, in the Lender's sole discretion and without waiving any of its other rights and remedies, the principal of the Advances outstanding from time to time shall bear interest at the Default Rate, effective for any periods designated by the Lender from time to time during that Default Period.

The parties' dispute turns on the final clause's interpretation. Because a reasonable interpretation of that clause is that it specifies what default rate will apply—the default rate is not constant—the Court rejects Nebraska Beef's contention that Section 2.11(c) unambiguously prohibits WFBCI from imposing the default interest rate after the default period's termination.

With regard to the default letter of credit fees, Section 2.12(d) of the Amended Agreement provides:

> The Borrower agrees to pay the Lender a fee with respect to each letter of credit, if any, from and including the date of issuance of such Letter of Credit until such date as such Letter of Credit shall terminate by its terms or be returned to the Lender, due and payable monthly in arrears on the first day of each month and on the Termination Date. Such fee shall accrue on a daily basis and be computed at the annual rate of one percent (1.0%), except during Default Periods when in the Lender's sole discretion such rate shall be three percent (3.0%), of the aggregate amount that may then be drawn on all issued and outstanding Letters of Credit, assuming compliance with all conditions for drawing thereunder. The foregoing fee shall be in addition to any and all fees, commissions and charges of any Issuer of a Letter of Credit with respect to or in connection with such Letter of Credit.

Nebraska Beef acknowledges that imposition of the default letter of credit fees is subject to WFBCI's "sole discretion." Accordingly, Nebraska Beef asserts that WFBCI's ability to impose the fees is subject to the restriction set forth in Section 8.2—that is, that WFBCI cannot impose

them after the default period's termination. As already discussed, Section 8.2 does not unambiguously restrict WFBCI's ability to exercise the rights and remedies of the Amended Agreement. The Court therefore rejects Nebraska Beef's argument that the Amended Agreement unambiguously precludes the imposition of the default letter of credit fees after the default period's termination.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Nebraska Beef's Motion for Summary Judgment [Docket No. 13] is DENIED.

2. WFBCI's Motion for Partial Summary Judgment [Docket No. 21] is GRANTED.

Dated: January 20, 2004

JOAN N. ERICKSEN
United States District Judge